## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN SAXER and CAROLYNN SAXER, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | CLASS ACTION |
| v. | |
| GEISINGER HEALTH PLAN, and NUANCE COMMUNICATIONS, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs John and Carolynn Saxer, h/w ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through the undersigned attorneys, bring this class action against Defendants Geisinger Health Plan ("Geisinger") and Nuance Communications, Inc. ("Nuance") (collectively "Defendants") and complain and allege upon personal knowledge as to themselves and upon information and belief as to all other matters.

## INTRODUCTION

1.     Plaintiffs bring this class action against Defendants for their failure to secure and safeguard personally identifiable information ("PII") and personal health information ("PHI") (collectively, "Personal Information") for approximately 1.2 million patients of or other persons affiliated with Defendants.

1

2.      Defendant Geisinger is Pennsylvania-based entity comprised of primary care providers serving urban and rural communities across Pennsylvania. Geisinger describes itself as "among the nation's leading providers of value-based care, serving 1.2 million people in urban and rural communities across Pennsylvania."

3.      Defendant Nuance is a vendor utilized by Defendant Geisinger for its information technology services.

4.      As a condition of receiving healthcare services, Geisinger's clients and their patients are required to provide and entrust Geisinger with sensitive and private information, including PII and PHI. The Personal Information that Geisinger collects and maintains includes names, addresses, healthcare member IDs, and other information provided during health assessments. On information and belief, Defendant Nuance houses and manages this patient data, including PII and PHI.

5.      On or around November 29, 2023, Geisginer discovered that a former Nuance employee had accessed certain Geisinger patient information two days after the employee was terminated.

6.      At some point following this discovery, Nuance began an investigation, which revealed that the former employee had accessed and taken information pertaining to more than one million Geisinger patients (the "Data Breach").

7.      The impacted files contained patient information, including names,

dates of birth, addresses, admit and discharge or transfer codes, medical record numbers, patient race information, patient gender information, and phone numbers.

8.    Geisinger did not announce the Data Breach publicly until on or around June 24, 2024 and did not file a breach with the U.S. Department of Health & Human Services until June 21, 2024.

9.    Geisinger's notice on its website provides scant detail about the Data Breach and the steps that Defendants are taking to address it. The notice merely states that Geisinger "discovered and immediately notified Nuance that a former Nuance employee had accessed certain Geisinger patient information two days after the employee had been terminated." It further reports that its "[t]hrough its investigation, Nuance determined the former employee may have accessed and taken information pertaining to more than one million Geisinger patients," and that "[t]he information varied by patient but could have included names in combination with one or more of the following: date of birth, address, admit and discharge or transfer code, medical record number, race, gender, phone number and facility name abbreviation."

10.    Geisinger did not state that it would be sending notices to affected individuals. Instead, it merely stated, "Geisinger encourages those who have received a notice to review the information and contact the number below to address any concerns." It also encouraged patients whose information was involved to

"review the statements they receive from their health plan and contact their health insurer immediately if they see services they did not receive."

11.    Geisinger's notice did not disclose how it discovered the encrypted files on its computer systems were impacted, the reason for the months-long delay in notifying Plaintiffs and the class of the Data Breach, how Geisinger determined that the PII/PHI had been "accessed" by the unauthorized actor, and, importantly, what steps Defendants took following the Data Breach to secure its systems and prevent future cyberattacks, other than that Nuance "disconnected its former employee's access to Geisinger's records."

12.    The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect patients' Personal Information from the foreseeable threat of a cyberattack.

13.    By being entrusted with Plaintiffs' and class members' Personal Information for its own pecuniary benefit, Defendants assumed a duty to Plaintiffs and class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiffs' and class members' Personal Information against unauthorized access and disclosure. Defendants also had a duty to adequately safeguard this Personal Information under controlling Pennsylvania case law, as well as pursuant to industry standards and duties imposed by statutes, including HIPAA regulations and Section 5 of the Federal Trade Commission Act

("FTC Act"). Defendants breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect patients' PII and PHI from unauthorized access and disclosure.

14.    As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiffs and over 1.2 million class members suffered injury and ascertainable losses in the form of out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminution in value of their personal information from its exposure, and the present and imminent thread of fraud and identity theft. This action seeks to remedy these failings and their consequences.

15.    The injury to Plaintiffs and class members was compounded by the fact that Defendants did not notify patients that their Personal Information was subject to unauthorized access and exfiltration until June 24, 2024, nearly seven months after the Data Breach was discovered. Defendants' failure to timely notify the victims of its Data Breach meant that Plaintiffs and class members were unable to immediately take affirmative measures to prevent or mitigate the resulting harm.

16.    Despite having been accessed and exfiltrated by unauthorized criminal actors, Plaintiffs' and class members' sensitive and confidential Personal Information remain in the possession of Defendants. Absent additional safeguards

and independent review and oversight, the information remains vulnerable to further cyberattacks and theft.

17.    Defendants disregarded the rights of Plaintiffs and class members by, *inter alia*, failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard patient Personal Information; failing to take standard and reasonably available steps to prevent the Data Breach; failing to properly train their staff and employees on proper security measures; failing to remove access to sensitive information from individuals no longer employed with Defendants; and failing to provide Plaintiffs and class members prompt and adequate notice of the Data Breach.

18.    In addition, Defendants and their employees failed to properly monitor the computer network and systems that housed the Personal Information. Had Defendants properly monitored these electronic systems, and ensured only authorized individuals had access, they would have discovered the intrusion sooner or prevented it altogether.

19.    The security of Plaintiffs' and class members' identities is now at risk because of Defendants' wrongful conduct as the Personal Information that Defendants collected and maintained is now in the hands of data thieves. This present risk will continue for the course of their lives.

20.    Armed with the Personal Information accessed in the Data Breach, data thieves can commit a wide range of crimes including, for example, opening new financial accounts in class members' names, taking out loans in their names, using class members' identities to obtain government benefits, filing fraudulent tax returns using their information, obtaining driver's licenses in class members' names, and giving false information to police during an arrest.

21.    As a result of the Data Breach, Plaintiffs and class members have been exposed to a present and imminent risk of fraud and identity theft. Among other measures, Plaintiffs and class members must now and in the future closely monitor their financial accounts and medical records to guard against identity theft. Further, Plaintiffs and class members will incur out-of-pocket costs to purchase credit monitoring and identity theft protection and insurance services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

22.    Plaintiffs and class members will also be forced to expend additional time to review credit reports and monitor their financial accounts and medical records for fraud or identity theft. And because the exposed information includes immutable personal details, the risk of identity theft and fraud will persist throughout their lives.

23.    Plaintiffs bring this action individually, and on behalf of individuals in the United States whose Personal Information was exposed as a result of the Data

Breach, which Defendants learned of on or about November 29, 2023 and first publicly acknowledged on or about June 24, 2024. Plaintiffs and class members seek to hold Defendants responsible for the harms resulting from the massive and preventable disclosure of such sensitive and personal information. Plaintiffs seek to remedy the harms resulting from the Data Breach individually, and on behalf of all similarly situated individuals whose Personal Information was accessed and exfiltrated during the Data Breach.

24.    Plaintiffs, individually, and on behalf of all other class members, bring claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, unjust enrichment, violations of state consumer protection statutes, and for declaratory and injunctive relief. To remedy these violations of law, Plaintiffs and class members thus seek actual damages, statutory damages, restitution, and injunctive and declaratory relief (including significant improvements to Defendants' data security protocols and employee training practices), reasonable attorneys' fees, costs, and expenses incurred in bringing this action, and all other remedies this Court deems just and proper.

## PARTIES

### Plaintiffs

#### *Plaintiffs John and Carolynn Saxer*

25.    Plaintiffs are residents and citizens of the Commonwealth of

Pennsylvania, and reside in Berwick, Pennsylvania.

26.    Plaintiffs provided PII/PHI to Geisinger in connection with receiving health care services from Geisinger. In requesting and maintaining Plaintiffs' Personal Information for its business purposes, Geisinger expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiffs' Personal Information. Geisinger and its vendor Nuance, however, did not take proper care of Plaintiffs' Personal Information, leading to its exposure to and exfiltration by cybercriminals as a direct result of Defendants' inadequate security measures.

27.    Plaintiffs received a letter from Defendants notifying Plaintiffs that their PII/PHI may have been exposed in the Data Breach.

28.    Once Personal Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs will need to maintain these heightened measures for years, and possibly their entire lives.

29.    Plaintiffs also suffered actual injury from having Private Information compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiffs' confidential personal information—a form of property that Plaintiffs entrusted to Defendants, which was compromised as a result of the Data Breach they failed to prevent and (b) a violation of Plaintiffs'

privacy rights as a result of Defendants' unauthorized disclosure of their Personal Information.

30.    Plaintiffs greatly value privacy, especially while receiving medical services. Had Plaintiffs known that Defendants do not adequately protect PII/PHI, they would not have used Geisinger's services and agreed to provide Geisinger with PII/PHI.

31.    As a result of Defendants' failure to adequately safeguard Plaintiffs' information, Plaintiffs have been injured. Plaintiffs are also at a continued risk of harm because their information remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as Defendants fail to undertake the necessary and appropriate data security measures to protect the PII and PHI in their possession.

**Defendants**

32.    Defendant Geisinger Health Plan is a Pennsylvania-based non-profit healthcare provider. Its principal place of business is located at 100 North Academy Avenue, Danville, Pennsylvania 17822.

33.    Defendant Nuance Communications, Inc. is a Delaware corporation with its headquarters located at 1 Wayside Road, Burlington, Massachusetts 01803.

## JURISDICTION AND VENUE

34.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the class is a citizen of a different state than Defendants, there are more than 100 members of the class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

35.    This Court has personal jurisdiction over Defendant Geisinger because it maintains its principal place of business in Pennsylvania and conducts substantial business in Pennsylvania and in this district through its principal place of business; engaged in the conduct at issue herein from and within this District; and otherwise has substantial contacts with this District and purposely availed itself of the Courts in this District.

36.    This Court has personal jurisdiction over Defendant Nuance because it regularly conducts business in this State, contracts to supply services in this State, and has sufficient minimum contacts in this State.

37.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Geisinger resides in this district, and this district is where a substantial part of the acts, omissions, and events giving rise to Plaintiffs' claims occurred.

## FACTUAL ALLEGATIONS

**A.     Overview of Defendants**

38.     Geisinger claims to "serv[e] 1.2 million people in urban and rural communities across Pennsylvania."[1] Geisinger "generates $10 billion in annual revenues across 134 care sites - including 10 hospital campuses and Geisinger Health Plan, with 600,000 members in commercial and government plans."[2]

39.     Nuance provides healthcare technology services, including clinical solutions, diagnostic solutions, and revenue services.[3] Nuance's "AI-powered solutions" are used "by 77% of hospitals and 10,000 healthcare organizations worldwide" and "capture 300 million patient stories each year.[4]

40.     In the regular course of its business, Geisginer collects and maintains the PII/PHI of patients, former patients, and other persons to whom it is currently providing or previously provided health-related or other services.

41.     As a regular part of its business, Geisinger requires patients to provide personal information before it provides them services. That information includes,

---

[1] *Geisinger provides notice of Nuance's data security incident*, GEISINGER (June 24, 2024), https://www.geisinger.org/about-geisinger/news-and-media/newsreleases/ 2024/06/24/18/17/geisinger-provides-notice-of-nuances-data-security-incident [hereinafter, the "Data Breach Notice"].
[2] *Id*.
[3] *See Healthcare AI Solutions & Services*, NUANCE, https://www.nuance.com/healthcare.html#standardpage-mainpar_multicolumn_33546632 (last accessed July 2, 2024).
[4] *Id.*

*inter alia*, names, addresses, dates of birth, health insurance information, and other relevant personal information. Geisinger stores this information digitally.

42.    Geisinger shared Plaintiffs and class members' PII and PHI with Nuance in connection with using the services provided by Nuance.

43.    As a HIPAA covered business entity (*see infra*), Defendants are required to implement adequate safeguards to prevent unauthorized use or disclosure of Personal Information, including by implementing requirements of the HIPAA Security Rule[5] and to report any unauthorized use or disclosure of Personal Information, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

44.    In its Privacy Policy, Geisinger states that it is "important to Geisinger Health Plan (GHP) to uphold the trust of our members and those with whom we interact. We are committed to assuring the confidentiality of your PHI."[6] It also states that it "is required by law to maintain the privacy of your PHI, provide this

---

[5] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. *See* 45 C.F.R. Part 160 and Part 164, Subparts A and C.

[6] *Our Privacy Policy*, Geisinger, (Jan. 2024), https://www.geisinger.org/about-geisinger/corporate/corporate-policies/hipaa/notice-of-privacy-practices-ghp (last accessed July 2, 2024).

notice about its information practices and follow the information practices that are described in this notice."[7]

45.    In its Privacy Statement, Nuance states, "[w]e provide medical voice recognition, medical imaging, transcription, and clinical documentation Products to hospitals and medical providers. To deliver these Products, we may collect patient data both directly from our healthcare customers as well as from vendors serving our healthcare customers such as individual doctors, imaging and laboratory service providers, and electronic health record service providers. This patient data may include name, address, gender, birthdate, medical record number, diagnosis, image, and treatment information."[8]

46.    Nuance's Privacy Statement goes on to say, "We follow generally accepted standards to protect the personal data submitted to us, both during transmission and once it is received. Information you provide to us is stored on our secure servers. Any payment transactions will be encrypted using current PCI-DSS standards."[9] It also states that it "follow[s] generally accepted standards to protect [] personal data."[10]

---

[7] *Id.*
[8] *Nuance Privacy Statement*, Nuance, (Jan. 1, 2024), https://www.nuance.com/about-us/company-policies/privacy-policies.html, (last accessed July 1, 2024).
[9] *Id.*
[10] *Id.*

47.     In its Data Governance Program, Nuance claims it "assesses our process, procedures, and systems on a routine and regular basis to ensure that updates and improvements are implemented to maintain our standards."[11] It further promises it "conducts training on at least an annual basis, and more frequently as needed, to ensure workforce members are aware of their roles and responsibilities related to data governance."[12]

48.     In Nuance's Technical and Organizational Details webpage, it states that it "maintains adequate technical and organizational measures, through the implementation and enforcement of the following policies: […]

> Workforce Clearing, Training and Sanctions
> All Nuance personnel are subject to background checks before access to restricted data is permitted. All personnel receive regular security training. Nuance has adopted policies and procedures to apply workforce sanctions to employees who fail to comply with Nuance security policies and procedures
>
> […]
>
> Access
> Nuance has located all equipment that stores Personal Data in controlled access areas. Nuance will only allow employees and contingent workers with a business purpose to have access to such controlled areas.
>
> […]

---

[11] *Data governance program*, Nuance, https://www.nuance.com/about-us/trustcenter/privacy/data-governance.html (last accessed July 2, 2024).
[12] *Id.*

<u>Network Security</u>
Nuance has implemented appropriate supplementary measures to protect Personal Data against the specific risks presented by the Services. All data is protected by encryption in transit over open, public networks. Data at rest is protected either by encryption or compensating security controls, which include segmented networks, tiered architecture, firewalls with intrusion protection and anti-malware protections, and limiting of port access.

[…]

<u>Monitoring</u>
Nuance takes appropriate steps to monitor the security of Personal Data and (if appropriate) to identify patterns of suspect activity. Nuance designs applications and services to suppress sensitive data being stored by Nuance. For every identified hosted change, security and QA teams review the data mapping requirements to validate the intended fields continue to be suppressed. Nuance also monitors security logging events which include log-on violations or attempts."[13]

49.    Plaintiffs and class members are, or were, patients of Geisinger or received health-related or other services from Geisinger, or otherwise are affiliated or transacted with Geisinger, and entrusted Geisinger with their PII/PHI. Geisinger in turn shared Plaintiffs and class members' PII/PHI with Nuance.

**B.    Defendants are HIPAA Covered Business Associates**

50.    Geisinger is a healthcare provider that provides healthcare services through locations throughout Pennsylvania. Geisinger is supported by the Health

---

[13] *Technical and organizational details*, Nuance, https://www.nuance.com/about-us/terms-and-conditions/data-processing-terms/TOMs-20180612.html (last accessed July 1, 2024)

Resources and Services Administration (HRSA) of the U.S. Department of Health and Human Services (HHS).

51.    In the regular course of its business, Geisinger collects and maintains the Personal Information of patients, former patients, and other persons through its healthcare providers.

52.    Geisinger is a HIPAA covered business associate that provides healthcare services to patients. As a regular and necessary part of its business Geisinger collects and custodies the highly sensitive Patient Information of its patients. Geisinger is required under federal and state law to maintain the strictest confidentiality of the patient's Personal Information that it requires, receives, and collects, and Geisinger is further required to maintain sufficient safeguards to protect that Personal Information from being accessed by unauthorized third parties.

53.    Nuance is a HIPAA covered business associate that provides services to healthcare providers. As a regular and necessary part of its business Nuance collects and custodies the highly sensitive Patient Information of its clients' patients. Nuance is required under federal and state law to maintain the strictest confidentiality of the patient's Personal Information that it requires, receives, and collects, and Nuance is further required to maintain sufficient safeguards to protect that Personal Information from being accessed by unauthorized third parties.

54.    As  HIPAA covered business entities, Defendants are required to implement adequate safeguards to prevent unauthorized use or disclosure of Personal Information, including by implementing requirements of the HIPAA Security Rule[14] and to report any unauthorized use or disclosure of Personal Information, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

55.    As a condition of receiving Geisinger's services, Geisinger requires that patients, including Plaintiffs and class members, entrust it with highly sensitive personal information. Due to the nature of Geisinger's business of providing healthcare services, Geisinger would be unable to engage in its regular business activities without collecting and aggregating Personal Information that it knows and understands to be sensitive and confidential.

56.    Plaintiffs and class members are or were patients whose medical records were maintained by, or who received health-related or other services from, Geisinger and directly or indirectly entrusted Defendants with their Personal Information. Plaintiffs and class members reasonably expected that Defendants

---

[14] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. *See* 45 C.F.R. Part 160 and Part 164, Subparts A and C.

would safeguard their highly sensitive information and keep their Personal Information confidential.

## C.    The Data Breach Compromised Plaintiffs' and Class Members' PII/PHI

57.    On or about November 29, 2023, according to the notice Geisinger posted to its website, Geisginer discovered that a former Nuance employee had accessed certain Geisinger patient information two days after the employee was terminated.

58.    Geisinger did not publicly announce the Data Breach until seven months later. It provided a summary of the Data Breach on its website on or around June 24, 2024. The press release Geisinger posted on its website states that the unauthorized party accessed files within its system that contained "information [which] varied by patient but could have included names in combination with one or more of the following: date of birth, address, admit and discharge or transfer code, medical record number, race, gender, phone number and facility name abbreviation."[15]

59.    Geisinger's press release also vaguely describes the measures it took following its discovery of the Data Breach, stating only that:

---

[15] *Geisinger provides notice of Nuance's data security incident*, Geisinger (June 24, 2024), https://www.geisinger.org/about-geisinger/news-and-media/newsreleases/ 2024/06/24/18/17/geisinger-provides-notice-of-nuances-data-security-incident

Upon learning [of the unauthorized access], Nuance permanently disconnected its former employee's access to Geisinger's records. An investigation was launched, and law enforcement was engaged.[16]

60.    Geisinger's notice omits pertinent information including how the former employee gained access to the encrypted files on its systems, what computer systems were impacted, the means and mechanisms of the cyberattack, how it determined that the Personal Information had been "accessed," and of particular importance to Plaintiffs and class members, what actual steps Defendants took following the Data Breach to secure its systems and train its employees to prevent further cyberattacks.

61.    The employee responsible for the Data Breach, Max Vance, was arrested two months after Geisinger discovered the Data Breach, and faces felony criminal charges. Reports indicate the employee responsible for the Data Breach "had significant indicators of past and intended criminal conduct."[17]

62.    Based on Defendants' acknowledgment that Personal Information was "accessed" by an unauthorized party, it is evident that unauthorized criminal actors

---

[16] *Id.*

[17] Dissent, *If the insider threat is at your vendor, could you discover it quickly?,* Databreaches.net (June 25, 20240), https://databreaches.net/2024/06/25/when-the-insiderthreat-is-at-your-vendor-could-you-discover-it-quickly/; Naomi Diaz, *Geisinger patient data compromised by IT vendor's ex-employee*, Becker's Hosp. Rev. (June 25, 2024), https://www.beckershospitalreview.com/cybersecurity/geisinger-patient-data-compromised-byit-vendors-ex-employee.html.

did in fact access Nuance's network and exfiltrate Plaintiffs' and class members' Personal Information in an attack designed to acquire that sensitive, confidential, and valuable information.

63.    The Personal Information contained in the files accessed by cybercriminals appears not to have been encrypted because if properly encrypted, the attackers would have acquired unintelligible data and would not have "accessed" Plaintiffs' and class members' Personal Information.

64.    The Data Breach reportedly impacted the protected health information of more than one million individuals.[18]

65.    As a HIPAA associated business entity that collects, creates, and maintains significant volumes of Private Information, the targeted attack was a foreseeable risk of which Defendants were aware and knew they had a duty to guard against.

66.    The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Personal Information of patients, like Plaintiffs and class members.

67.    Despite detecting the Data Breach on or around November 29, 2023, Defendants waited nearly seven months following the completion of its investigation to notify the impacted individuals of the Data Breach and of the need for them to

---

[18] *Id.*

protect themselves against fraud and identity theft. Defendants were, of course, too late in the discovery and notification of the Data Breach. Geisinger summarily states in its notice that "[b]ecause it could have impeded their investigation, law enforcement investigators asked Nuance to delay notifying patients of this incident until now," but provides no further explanation for the seven month delay.[19]

68.    Due to Defendants' inadequate security measures and delayed notice to victims, Plaintiffs and class members now face a present, immediate, and ongoing risk of fraud and identity theft and must deal with that threat forever.

69.    Defendants had obligations created by HIPAA, contract, industry standards and common law made to Plaintiffs and class members to keep their Personal Information confidential and to protect it from unauthorized access and disclosure.

70.    Plaintiffs and class members entrusted their Personal Information to Defendants with the reasonable expectation and mutual understanding that Defendants or anyone who used their Personal Information in conjunction with the healthcare services they received would comply with obligations to keep such information confidential and secure from unauthorized access after it received such information.

---

[19] *Id.*

71.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and class members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and class members' Personal Information from unauthorized disclosure.

72.    Plaintiffs and the class members have taken reasonable steps to maintain the confidentiality of their personal information. Plaintiffs and class members would not have allowed Defendants or anyone in Defendants' position to receive their PII/PHI had they known that Defendants would fail to implement industry standard protections for that sensitive information.

73.    As a result of Defendants' negligent and wrongful conduct, Plaintiffs' and class members' highly confidential and sensitive Personal Information was left exposed to cybercriminals.

**D.    Defendants Were Obligated Under HIPAA to Safeguard the Personal Information**

74.    Defendants are each a covered business associate under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

75.    Defendants are subject to the rules and regulations for safeguarding

electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[20] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

76.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

77.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

78.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

79.     "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

80.     HIPAA's Security Rule requires Defendants to do the following:

    a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate

---

[20] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information.  HITECH references and incorporates HIPAA.

creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

81. HIPAA also requires Defendants to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

82. HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

83. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual

"without unreasonable delay and in no case later than 60 days following the discovery of a breach."[21]

84.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

85.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

86.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis

---

[21] *Breach Notification Rule*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last accessed on July 2, 2024) (emphasis added).

requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[22] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[23]

### E.    Defendants Failed to Follow FTC Guidelines

87.    Defendants were also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

88.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

---

[22]    *Security Rule Guidance Material*, U.S. Dep't of Health & Human Servs., http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html    (last accessed on July 2, 2024).

[23]    *Guidance on Risk Analysis*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last accessed on July 2, 2024).

89.    According to the FTC, the need for data security should be factored into all business decision-making.

90.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.

91.    The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

92.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

93.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

94.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

95.    Defendants failed to properly implement basic data security practices.

96.    Defendants' failures to employ reasonable and appropriate measures to protect against unauthorized access to patients' and plan members Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

97.    Defendants were at all times fully aware of its obligation to protect the Private Information of the patients and plan members about whom it stored Private Information. Defendants were also aware of the significant repercussions that would result from its failure to do so.

**F.    Defendants Failed to Comply with Industry Standards**

98.    As described above, experts studying cyber security routinely identify healthcare providers and their business associates as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

99.     Several best practices have been identified that at a minimum should be implemented by HIPAA covered business entities like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

100.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

101.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

102.    These foregoing frameworks are existing and applicable industry

standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

**G.    Defendants Owed Plaintiffs and Class Members a Duty to Safeguard Their Personal Information**

103.    In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiffs and class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of class members.

104.    Defendants owed a duty to Plaintiffs and class members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

105.    Defendants owed a duty to Plaintiffs and class members to implement processes that would detect a compromise of Private Information in a timely manner.

106.   Defendants owed a duty to Plaintiffs and class members to act upon data security warnings and alerts in a timely fashion.

107.   Defendants owed a duty to Plaintiffs and class members to disclose in a timely and accurate manner when and how the Data Breach occurred.

108.   Defendants owed a duty of care to Plaintiffs and class members because they were foreseeable and probable victims of any inadequate data security practices.

## H.    Defendants Knew That Criminals Target PII/PHI

109.   Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry and other industries holding significant amounts of PII and PHI preceding the date of the breach.

110.   At all relevant times, Defendants knew, or should have known, its patients', Plaintiffs', and all other class members' PII/PHI was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and class members' Private Information from cyber-attacks that Defendants should have anticipated and guarded against.

111.   The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of patients and/or plan members, like Plaintiffs and class members.

112.   Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2024 report, the healthcare compliance company Proetus found that there were 1161 medical data breaches in 2023, leaving over 171 million patient records exposed for the 2023 incidents. This is an increase from the 59.6 million medical records that Protenus identified as breached in 2022.[24]

113.   The percentage of healthcare breaches attributed to unauthorized access or disclosure was approximately 93%.[25]

114.   Of the total medical data breaches, the healthcare sector suffered about 725 large breaches in 2023, according to the HIPPAA Journal's Securtiy Breaches in Healthcare report.[26]

115.   Further, a 2022 report released by IBM Security states that for 12 consecutive years the healthcare industry has had the highest average cost of a data breach and as of 2022 healthcare data breach costs have hit a new record high.[27]

116.   Personal Information is a valuable property right.[28] The value of

---

[24] *2024 Breach Barometer*, Protenus (2024), https://www.protenus.com/breach-barometer-report.

[25] *Id*.

[26] *Security Breaches in Healthcare in 2023*, HIPAA Journal (Jan. 31, 2024), https://www.hipaajournal.com/security-breaches-in-healthcare/

[27] *Cost of a Data Breach Report 2022*, IBM Security (July 2022), https://www.ibm.com/downloads/cas/3R8N1DZJ.

[28] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP Advances in Information and Communication Technology (May 2015), https://www.researchgate.net/publication/283668023 ("The value of [personal]

Personal Information as a commodity is measurable.[29] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[30] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[31] It is so valuable to identity thieves that once Personal Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

117.    As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, Personal Information, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data

---

information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible...").

[29] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, Medscape (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[30] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220, OECD Publishing (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[31] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, Interactive Advertising Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

118.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[32] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[33] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[34]

119.    Personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[35] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[36] All-inclusive

---

[32] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech Magazine (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[33] *Id.*

[34] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

[35] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[36] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-

health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[37] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[38] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[39]

120.   Criminals can use stolen Personal Information to extort a financial payment by "leveraging details specific to a disease or terminal illness."[40] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted

---

experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[37] Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC Magazine (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[38] *In the Dark*, VPNOverview.com, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed on Nov. 14, 2022).

[39] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI Cyber Division (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[40] *See* n.19, *supra*.

disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[41]

121.    Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[42]

122.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Personal Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

123.    Indeed, cyberattacks against the healthcare industry have been common for over ten years with the Federal Bureau of Investigation ("FBI") warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing

---

[41] *Id.*

[42] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Information Systems Research 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[43]

124. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[44]

125. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[45]

126. Defendants were on notice that the FBI has recently been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally

---

[43] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

[44] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[45] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack,* Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

Identifiable Information (PII)."[46]

127. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[47]

128. As implied by the above AMA quote, stolen Private Information can be used to interrupt important medical services. This is an imminent and certainly impending risk for Plaintiffs and class members.

129. Defendants were on notice that the federal government has been concerned about healthcare company data encryption practices. Defendants knew their employees accessed and utilized protected health information in the regular course of their duties, yet it appears that information was not encrypted.

---

[46] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[47] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, American Medical Association (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

130.    The Office for Civil Rights ("OCR") urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, OCR's deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[48]

131.    As HIPAA covered business associates, Defendants should have known about their data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the Personal Information stored in its unprotected files.

## I.    Theft of PII/PHI Has Grave and Lasting Consequences for Victims

132.    Theft of PII/PHI is serious. The Federal Trade Commission ("FTC") warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[49]

---

[48] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. Dept. of Health and Human Servs. (Apr. 22, 2014), https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

[49] *See What to Know About Identity Theft*, Federal Trade Commission Consumer Advice, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed on July 2, 2024).

133.    Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[50] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.[51]

134.    With access to an individual's Personal Information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture, using the victim's name and SSN to obtain

---

[50] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[51] Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, Experian (Sept. 1, 2017), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

government benefits, or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[52]

135.   Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.  For example, with the Private Information stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.   These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and class members.

136.   Personal Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on dark web black-markets for years.

137.  For example, it is believed that certain highly sensitive personal

---

[52] *See Warning Signs of Identity Theft*, Federal Trade Commission, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited July 2, 2024).

information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

138.    The Personal Information exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein. These risks are both certainly impending and substantial. As the FTC has reported, if cyber thieves get access to a person's highly sensitive information, they will use it.[53]

139.    Cyber criminals may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[54]

140.    Theft of PII is even more serious when it includes theft of PHI. Medical identity theft is one of the most common, most expensive, and most difficult-to-

---

[53] Ari Lazarus, *How fast will identity thieves use stolen info?*, Federal Trade Commission (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

[54] *Report to Congressional Requesters: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, United States Government Accountability Office, https://www.gao.gov/assets/gao-07-737.pdf.

prevent forms of identity theft. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more than identity thefts involving banking and finance, the government and the military, or education.[55] "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[56]

141.    Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[57] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[58] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use Personal Information "to see a doctor, get prescription drugs, buy medical devices, submit claims with your

---

[55] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.
[56] *Id.*
[57] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, World Privacy Forum  (Dec. 12, 2017), https://www.worldprivacyforum.org/2017/12/new-report-the-geography-of-medical-identity-theft/.
[58] *See* n.39, *supra.*

insurance provider, or get other medical care." [59] The FTC also warns, "If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[60]

142.    A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

---

[59] *See* n.49, *supra*.

[60] *Id.*

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[61]

143.  There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

144.  For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[62]

145.  It is within this context that Plaintiffs and all other class members must now live with the knowledge that their Personal Information is forever in cyberspace

---

[61] *See* n.57, *supra*.

[62] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

146.   A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:



147.   Victims of the Data Breach, like Plaintiffs and class members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[63]

---

[63] *Guide for Assisting Identity Theft Victims*, Federal Trade Commission, 4 (Sept. 2013),    http://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

148.    As a direct and proximate result of the Data Breach, Plaintiffs and class members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.  Plaintiffs and class members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

149.    Plaintiffs and class members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

       a.  Trespass, damage to, and theft of their personal property, including Private Information;

       b.  Improper disclosure of their Private Information;

       c.  The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Private Information being in the hands of criminals and having already been misused;

d.   The imminent and certainly impending risk of having their confidential medical information used against them by spam callers to defraud them;

e.   Damages flowing from Defendants' untimely and inadequate notification of the Data Breach;

f.   Loss of privacy suffered as a result of the Data Breach;

g.   Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the data breach;

h.   Ascertainable losses in the form of deprivation of the value of patients' personal information for which there is a well-established and quantifiable national and international market;

i.   The loss of use of and access to their credit, accounts, and/or funds;

j.   Damage to their credit due to fraudulent use of their Private Information; and

k.   Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

150.   Moreover, Plaintiffs and class members have an interest in ensuring that their Personal Information, which remains in the possession of Defendants, is protected from further public disclosure by the implementation of better employee

training and industry standard and statutorily compliant security measures and safeguards. Defendants have shown themselves to be wholly incapable of protecting Plaintiffs' and class members' Private Information.

151.  Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries. For this reason, Defendants knew or should have known about these dangers and strengthened its data security accordingly. Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet they failed to properly prepare for that risk.

## J.    The Data Breach Was Foreseeable and Preventable

152.  Data disclosures and data breaches are preventable.[64] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[65] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[66]

---

[64] Lucy L. Thompson, *Despite the Alarming Trends, Data Breaches Are Preventable*,  Data Breach and Encryption Handbook (Lucy Thompson, ed., 2012).
[65] *Id.* at 17.
[66] *Id.* at 28.

153.   "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[67]

154.   As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[68]

155.   Plaintiffs and class members entrusted their Private Information to Geisinger as a condition of receiving healthcare related services. Plaintiffs and class members understood and expected that Geisinger or anyone in Geisinger's position would safeguard their Private Information against cyberattacks, delete or destroy Private Information that Geisigner was no longer required to maintain, and timely and accurately notify them if their Private Information was compromised. Plaintiffs and class members trusted that Geisinger would not transmit or otherwise disclose their Private Information to any third parties, including parties such as Nuance, who did not also follow these informational safeguards.

---

[67] *Id.*
[68] *See How to Protect Your Networks from RANSOMWARE*, at 3, FBI.gov, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

**K.    Plaintiffs' and Class Members' Damages**

156.    To date, Defendants have done nothing to provide Plaintiffs and class members with relief for the damages they have suffered as a result of the Data Breach. Not only have Defendants failed to provide any ongoing credit monitoring or identity protection services for all individuals impacted by the Data Breach, but credit monitoring alone would do nothing to compensate class members for damages incurred and time spent dealing with the Data Breach.

157.    Plaintiffs and class members have been damaged by the compromise of their Personal Information in the Data Breach.

158.    As a direct and proximate result of Defendants' conduct, Plaintiffs and class members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiffs and class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

159.    Plaintiffs and class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Personal Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and class members.

160.    Plaintiffs and class members have and will also incur out-of-pocket

costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

161.    Plaintiffs and class members have suffered or will suffer actual injury as a direct result of the Data Breach, including losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.  Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b.  Purchasing credit monitoring and identity theft prevention;

c.  Placing "freezes" and "alerts" with reporting agencies;

d.  Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e.  Contacting financial institutions and closing or modifying financial accounts; and

f.  Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

162.   Plaintiffs and class members suffered actual injury from having their Personal Information compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of their Personal Information, a form of property that Defendants obtained from Plaintiffs and class members; (b) violation of their privacy rights; (c) imminent and impending injury arising from the increased risk of identity theft and fraud; and (d) emotional distress.

163.   Further, as a result of Defendants' conduct, Plaintiffs and class members are forced to live with the anxiety that their Personal Information may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy with respect to that information.

164.   As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and class members have suffered a loss of privacy and are at a present and imminent and increased risk of future harm.

165.   Moreover, Plaintiffs and class members have an interest in ensuring that their Personal Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Personal Information is not accessible online, is properly encrypted, and that access to such data is password protected.

166.   Many failures laid the groundwork for the occurrence of the Data Breach, starting with Defendants' failure to incur the costs necessary to implement adequate and reasonable cyber security training, procedures and protocols that were necessary to protect Plaintiffs' and class members' Personal Information.

167.   Defendants maintained the Personal Information in an objectively reckless manner, making the Personal Information vulnerable to unauthorized disclosure.

168.   Defendants knew, or reasonably should have known, of the importance of safeguarding Personal Information and of the foreseeable consequences that would result if Plaintiffs' and class members' Personal Information was stolen, including the significant costs that would be placed on Plaintiffs and class members as a result of the breach.

169.   The risk of improper disclosure of Plaintiffs' and class members' Personal Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure Plaintiffs' and class members' Personal Information from that risk left the Personal Information in a dangerous condition.

170.   Defendants disregarded the rights of Plaintiffs and class members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that the Personal Information was

protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and class members' Personal Information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiffs and class members prompt and accurate notice of the Data Breach.

## CLASS ALLEGATIONS

171.    Plaintiffs bring this class action individually, and on behalf of all members of the following Class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23:

### Nationwide Class

All persons in the United States whose Personal Information was compromised in the Data Breach disclosed by Geisinger on or about June 24, 2024, including all who were sent notice of the Data Breach.

172.    Alternatively, or in addition to the Nationwide Class, Plaintiffs seek to represent the following state class:

### Pennsylvania Class

All persons in the Commonwealth of Pennsylvania whose Personal Information was compromised in the Data Breach disclosed by Geisinger on or about June 24, 2024, including all who were sent notice of the Data Breach.

173.   The nationwide class and the state class are collectively referred to as the "class." Excluded from the class are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

174.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

175.   Numerosity: The members in the class are so numerous that joinder of all class members in a single proceeding would be impracticable. As noted above, Geisinger reported that over a million individuals' information was exposed in the Data Breach.

176.   Commonality and Predominance: Common questions of law and fact exist as to all class members and predominate over any potential questions affecting only individual class members. Such common questions of law or fact include, *inter alia*:

    a.  Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendants' computer systems and data security practices used to protect Plaintiffs' and class members' Personal Information violated the FTC Act and/or HIPAA, and/or state laws and/or Defendants' other duties discussed herein;

c. Whether Defendants failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and class members;

d. Whether Plaintiffs and class members suffered injury as a proximate result of Defendants' negligent actions or failures to act;

e. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and class members' Personal Information;

f. Whether an implied contract existed between class members and Defendants providing that Defendants would implement and maintain reasonable security measures to protect and secure class members' Personal Information from unauthorized access and disclosure;

g. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiffs and class members;

h. Whether Defendants' actions and inactions alleged herein constitute gross negligence;

i. Whether Defendants breached their duties to protect Plaintiffs' and class members' Personal Information; and

j. Whether Plaintiffs and all other members of the class are entitled to damages and the measure of such damages and relief.

177. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs on behalf of themselves and all other class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

178. Typicality: Plaintiffs' claims are typical of the claims of the class. Plaintiffs, like all proposed members of the class, had Personal Information compromised in the Data Breach. Plaintiffs and class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all class members.

179. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the class members. Plaintiffs are adequate representative of the class as they have no interests adverse to, or that conflict with, the class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

180. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and all other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for class members to individually seek redress from Defendants' wrongful conduct. Even if class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
## NEGLIGENCE
### (On Behalf of Plaintiffs and the Classes, Against Defendants)

181.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

182.   Defendants owed a duty to Plaintiffs and all other class members to exercise reasonable care in safeguarding and protecting their PII/PHI in its possession, custody, or control.

183.   Defendants knew, or should have known, the risks of collecting and storing Plaintiffs' and all other class members' Personal Information and the importance of maintaining secure systems. Defendants knew, or should have known, of the many data breaches that targeted healthcare providers in recent years.

184.   Given the nature of Defendants' businesses, the sensitivity and value of the Private Information they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

185.   Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Personal

Information entrusted to it—including Plaintiffs' and class members' Personal Information.

186.   It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and class members' Personal Information to unauthorized individuals.

187.   But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiffs and class members, their Personal Information would not have been compromised.

188.   As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and all other class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for

which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) actual or attempted fraud.

**COUNT II**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiffs and the Classes, Against Defendants)**

189.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

190.    Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

191.    Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Defendants, of failing to employ reasonable measures to protect and secure Private Information.

192.    Defendants' duties further arise from the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1302(d), *et seq.*

193.    Defendants are entities covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

194.    Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and all other class members' Personal Information and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Personal Information they obtain and store, and the foreseeable consequences of a data breach involving Personal Information including, specifically, the substantial damages that would result to Plaintiffs and the other class members.

195.    Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

196.    Plaintiffs and class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

197.    The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

198.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and class members' Personal Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and class members' Personal Information to unauthorized individuals.

199.    The injury and harm that Plaintiffs and the other class members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiffs and class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Personal Information; (iii) breach of the confidentiality of their Personal Information; (iv) deprivation of the value of their Personal Information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) actual or attempted fraud.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiffs and the Classes, Against Defendants)

200.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

201.    Plaintiffs and class members either directly or indirectly gave Defendants their Personal Information in confidence, believing that Defendants would protect that information. Plaintiffs and class members would not have provided Defendants with this information had they known it would not be adequately protected. Defendants' acceptance and storage of Plaintiffs' and class members' Personal Information created a fiduciary relationship between Defendants and Plaintiffs and class members. In light of this relationship, Defendants must act primarily for the benefit of their patients and health plan participants, which includes safeguarding and protecting Plaintiffs' and class members' Personal Information.

202.    Defendants have a fiduciary duty to act for the benefit of Plaintiffs and class members upon matters within the scope of their relationship. They breached that duty by failing to properly protect the integrity of the system containing Plaintiffs' and class members' Personal Information, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard the Personal Information of Plaintiffs and class members they collected.

203.   As a direct and proximate result of Defendants' breaches of its fiduciary duties, Plaintiffs and class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Personal Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Personal Information compromised as a result of the Data Breach; and (vii) actual or attempted fraud.

**<u>COUNT IV</u>**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Classes, Against Defendants)**

204.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein. This claim is pled in the alternative pursuant to Fed. R. Civ. P. 8(d).

205.   Plaintiffs and class members conferred a monetary benefit upon Geisinger in the form of monies paid for healthcare services or other services. Those monetary benefits were additionally conferred to Nuance via Geisinger.

206.   Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiffs and class members. Defendants also benefitted from the receipt of Plaintiffs' and class members' PHI.

207.   As a result of Defendants' conduct, Plaintiffs and class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiffs and class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

208.   Defendants should not be permitted to retain the money belonging to Plaintiffs and class members because Defendants failed to adequately implement the data privacy and security procedures for itself that Plaintiffs and class members paid for and that were otherwise mandated by federal, state, and local laws. and industry standards.

209.   Defendants should be compelled to provide for the benefit of Plaintiffs and class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Classes, Against Geisinger Only)**

210.   Plaintiffs incorporate by reference all allegations of the preceding factual allegations as though fully set forth herein.

211.    Geisinger required Plaintiffs and class members to provide, or authorize the transfer of, their Personal Information in order for Geisinger to provide services. In exchange, Geisinger entered into implied contracts with Plaintiffs and class members in which Geisinger agreed to comply with its statutory and common law duties to protect Plaintiffs' and class members' Personal Information and to timely notify them in the event of a data breach.

212.    Plaintiffs and class members would not have provided their Personal Information to Geisinger had they known that it would not safeguard their Personal Information, as promised, or provide timely notice of a data breach.

213.    Plaintiffs and class members fully performed their obligations under their implied contracts with Geisinger.

214.    Geisinger breached the implied contracts by failing to safeguard Plaintiffs' and class members' Personal Information and by failing to provide them with timely and accurate notice of the Data Breach.

215.    The losses and damages Plaintiffs and class members sustained (as described above) were the direct and proximate result of Geisinger's breach of their implied contracts with Plaintiffs and class members.

## COUNT VI
## DECLARATORY AND INJUNCTIVE RELIEF
### (On behalf of Plaintiffs and the Classes, Against Defendants)

216.    Plaintiffs incorporate by reference the foregoing factual allegations as

if fully set forth herein.

217.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

218.    Defendants owe a duty of care to Plaintiffs and class members that require it to adequately secure Plaintiffs' and class members' Personal Information.

219.    Defendants still possesses the Personal Information of Plaintiffs and the class members.

220.    Defendants have not satisfied their contractual obligations and legal duties to Plaintiffs and the class members.

221.    Actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide security measures to Plaintiffs and class members. Further, Plaintiffs and class members are at risk of additional or further harm due to the exposure of their Personal Information and Defendants' failure to address the security failings that led to such exposure.

222.    There is no reason to believe that Defendants' employee training and security measures are any more adequate now than they were before the breach to meet Defendants' contractual obligations and legal duties.

223.    Plaintiffs therefore, seek a declaration (1) that Defendants' existing data security measures do not comply with its contractual obligations and duties of care to provide adequate data security, and (2) that to comply with their contractual

obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to, the following:

a. Ordering that Defendants maintain rigorous hiring practices and traning for all employees who have access to Private Information;

b. Ordering that Defendants engage internal security personnel to conduct testing, including audits on Defendants' systems, on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

c. Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

d. Ordering that Defendants audit, test, and train its security personnel and employees regarding any new or modified data security policies and procedures;

e. Ordering that Defendants purge, delete, and destroy, in a reasonably secure manner, any Private Information not necessary for its provision of services;

f. Ordering that Defendants conduct regular database scanning and security checks; and

g. Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel and

employees how to safely share and maintain highly sensitive personal information, including but not limited to, patient personally identifiable information and patient protected health information.

## COUNT VII
## VIOLATIONS OF THE PENNSYLVANI UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ("UTPCPL")
## 73 P.S. §§ 201-1-201-9.3
## (On behalf of Plaintiffs and the Pennsylvania Class, Against Gesinger Only)

224.    Plaintiffs realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

225.    Plaintiffs brings this claim individually and on behalf of the Pennsylvania Class (referred to as "class" for the purposes of this count), against Defendant Geisinger.

226.    Geisinger performs services in the Commonwealth of Pennsylvania.

227.    Plaintiff, class members, and Geisinger are "persons" as defined by the UTPCPL. 73 P.S. § 201-2(2).

228.    Geisinger's healthcare and other services constitute as "trade" and "commerce" under the statute. 73 P.S. § 201-2(3).

229.    Geisinger obtained Plaintiffs' and class members' PII/PHI in connection with the healthcare and other services that Geisinger performed.

230.    Geisinger engaged in unfair or deceptive acts in violation of the UTPCPL by failing to implement and maintain reasonable security measures to

protect and secure its patients' and former patients' PII/PHI in a manner that complied with applicable laws, regulations, and industry standards.

231.    Geisinger makes explicit statements to its customers that their PII/PHI will remain private, as evidenced by their Privacy Policy.

232.    The UTPCPL lists twenty-one instances of "unfair methods of competition" andv"unfair or deceptive acts or practices." 73 P.S. § 201-2(4). Geisinger's failure to adequately protect Plaintiffs' and class members' PII/PHI while holding out that it would adequately protect thevPII/PHI falls under at least the following categories:

   a.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have (73 P.S. § 201-2(4)(v));

   b.  Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another (73 P.S. § 201-2(4)(vii));

   c.  Advertising goods or services with intent not to sell them as advertised (73 P.S. § 201-2(4)(ix)); and

d. Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding (73 P.S. § 201-2(4)(xxi)).

233. Due to the Data Breach, Plaintiffs and class members have lost property in the form of their PII/PHI. Further, Geisinger's failure to adopt reasonable practices in protecting and safeguarding its customers' PII/PHI will force Plaintiffs and class members to spend time or money to protect against identity theft. Plaintiffs and Class members are now at a higher risk of identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Geisinger's practice of collecting and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

234. As a result of Geisinger's violations of the UTPCPL, Plaintiffs and class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Geisinger's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of

the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

235.   Pursuant to 73 P.S. § 201-9.2(a), Plaintiffs seek actual damages, $100, or three times their actual damages, whichever is greatest. Plaintiffs also seeks costs, expenses, and reasonable attorney fees.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other members of the class, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.   Certifying the class as requested herein, designating Plaintiffs as Class representative, and appointing Plaintiffs' counsel as Class Counsel;

B.   Awarding Plaintiffs and the class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.   Awarding Plaintiffs and the class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, individually and on behalf of the class, seek appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard Private Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.    Awarding Plaintiffs and the class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiffs and the class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Awarding Plaintiffs and the class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: July 2, 2024                    Respectfully submitted,


                                       */s/ Andrew W. Ferich*
                                       Andrew W. Ferich (PA 313696)
                                       **AHDOOT & WOLFSON, PC**
                                       201 King of Prussia Road, Suite 650
                                       Radnor, PA 19087
                                       Telephone: (310) 474-9111
                                       Facsimile: (310) 474-8585
                                       aferich@ahdootwolfson.com

                                       *Counsel for Plaintiffs*